DAVID W. WESTALL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Westall v. Commissioner
Docket No. 20433-84.
United States Tax Court
T.C. Memo 1988-421; 1988 Tax Ct. Memo LEXIS 439; 56 T.C.M. (CCH) 66; T.C.M. (RIA) 88421; September 6, 1988; As amended September 12, 1988 David Westall, pro se. Mary E. Jansing, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in and additions to petitioner's income tax: Additions to Tax
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
Sec. 6654
1978
$ 55,062
$ 13,766
$ 2,753
$ -0-
1979
58,124
14,531
2,906
2,423
1980
38,684
9,671
1,934
2,469
After concessions we must decide: (1) whether petitioner is entitled to alimony deductions in 1978, 1979, and 1980 in the respective amounts of $ 8,075, $ 2,650 and $ 2,340; (2) whether petitioner is entitled to two personal exemptions in each year from 1978 through 1980: (3) whether petitioner *443 received $ 40,000 in unreported income from his ex-wife, Jeanne Westall, in 1978; (4) whether petitioner received ordinary income or capital gainincome from a $ 5,000 nonrefundable deposit in 1980; (6) whether petitioner is entitled to Schedule C deductions in 1978, 1979, and 1980 in the respective amounts of $ 33,412, $ 32,866 and $ 26,995; (7) whether petitioner is entitled to additional investment tax credits fro 1978, 1979, and 1980 in the respective amounts of $ 15, $ 662 and $ 515; [2]
(8) whether petitioner is liable for self-employment tax for 1978 through 1980; (9) whether petitioner is liable for additions to tax under section 6651(a) for failure to file tax returns in 1978 through 1980; (10) whether petitioner is liable for addition to tax under section 6653(a) for negligence in 1978 through 1980; and (11) whether petitioner is liable for additions to tax under section 6654 for failure to pay estimated tax in 1979 and 1980. In his brief respondent states that petitioner and *444 respondent are in agreement as to the gross income received by petitioner except for $ 40,000 in 1978, $ 25,543 in 1979 and $ 5,000 in 1980. The record indicates there are also "other income" items in dispute (capital gain and net operating loss in 1979 and capital gain in 1980). Respondent has not addressed any of these "other income" items. Petitioner has, however, agreed with respondent's determination regarding capital gains for the 1979 taxable year. While petitioner did address the remaining items on brief, he did not present evidence in support of his position at trial. The arguments he makes on brief do not constitute evidence in support of his contentions. As a result, in the absence of an agreement between the parties as to the net operating loss for 1979 and the capital gain for 1980, we find that petitioner has not overcome the presumption of correctness of respondent's determination as to these facts. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioner resided in West Hollywood, Calif., at the time he filed his petition. Petitioner failed to file *445 Federal income tax returns in 1978, 1979 and 1980. In 1958 petitioner married Jacqueline Westall. The couple had three children. Petitioner and Jacqueline were divorced in 1967. At the time the divorce was granted, petitioner was required to pay $ 30 each week for child support in addition to a fixed sum of $ 5,500 designated by the county court as "alimony." Petitioner was still required to make child support payments throughout the years in issue. Petitioner was also once married to Rosinda Westall. Petitioner and Rosinda had a daughter, Marsiella. Petitioner made payments to Rosinda between 1978 and 1980. The payments were allegedly for alimony and child support. Based upon the payments to Rosinda petitioner claims that he is entitled to two exemptions in 1978, 1979 and 1980. During 1978, 1979 and 1980 petitioner received income from rental property, from auto sales and from the operation of movie theaters. For five months in 1978 petitioner operated a theater in King City, Calif., and one in Monterey, Calif. After September 1978, petitioner operated only the theater in King City. During 1978 petitioner also received at lest $ 40,000 [3] from his ex-wife, Jeanne *446 Westall. Jeanne transferred the money to petitioner to make investments on her behalf. Petitioner neither made the investments nor returned the money in 1978. However, in September of 1978 petitioner transferred to Jeanne title to a new 3,500 square foot house on 5 acres in Kentucky, as partial repayment of the $ 40,000. Petitioner purchased the house for $ 58,000 with $ 10,000 cash down. Apparently, Jeanne assumed the mortgage. The next day Jeanne sold the house to a neighbor for $ 76,000. Jeanne apparently took a second mortgage, because later when the purchasers defaulted she took back the house and resold it in 1984, at less than $ 76,000; the exact amount Jeanne received is unclear. Petitioner repaid Jeanne $ 6,000 in 1982 as additional reimbursement of the $ 40,000. *447 On February 15, 1979 petitioner purchased real property at 411 Ellis Street, King City, Calif. The stated purchase price was $ 55,000. In a three-cornered transaction, on July 6, 1979, petitioner exchanged the property on 411 Ellis Street in King City for property located at 1615 Flores Street, Seaside, Calif. In exchange for the King City house and assumption of liabilities on the Seaside property, petitioner received $ 9,354 in cash, a house valued at $ 50,000 and he surrendered liabilities of $ 47,436 on the King City property. In addition, petitioner incurred selling expenses of $ 3,318 on the exchange. Finally, petitioner sold the house in Seaside as part of the exchange and suffered a loss of $ 1,1816. On July 25, 1980 petitioner received and cashed a check in the amount of $ 5,000 from Taso Promotions of Chicago. The check was for an option on the sale of the Del Rio Theater [4] in King City, Calif. The $ 5,000 was to be applied toward the purchase price. The remainder of the purchase price was never paid. *448 Respondent has conceded that petitioner is allowed the following Schedule C and Schedule E deductions in connection with his auto sales, rental property and the operation of his movie theaters: 1978
1979
1980
Schedule C-Theaters
$ 105,136
$ 68,043
$ 79,903
Schedule C-Auto
17,491
9,985
3,594
Schedule E-Rentals
5,863
N/A
N/A
Petitioner did not file any returns but nevertheless claims he is also entitled to the following business expenses which respondent has disallowed for a lack of substantiation: 1978
1979
1980
Advertising
$ 1,075
$ 1,495
$ 2,493
Car & Truck
5,348
4,747
3,443
Depreciation
1,766
5,626
6,959
Legal & Professional
3,522
3,130
3,075
Rent
2,000
975
-0-
Repairs
2,599
691
879
Concession Supplies
1,105
3,292
1,287
Taxes
-0-
1,320
186
Travel & Entertainment
7,845
1,610
933
Film Rental & Delivery
3,331
7,368
3,851
Wages
4,821
2,712
3,889
Total
$ 33,412
$ 32,866
$ 26,995
Petitioner also claims that he is entitled to additional investment tax credits for the purchase of theater supplies in 1978, 1979 and 1980 in the respective amounts of $ 15, $ 622 *449 and $ 515. OPINION As a preliminary matter, petitioner submitted new documentation (receipts, invoices and affidavits) attached to his brief. We cannot and do not consider this material as part of the record. Rule 143(b). Furthermore petitioner was aware that we would not accept any additional evidence because we specifically stated to petitioner at trial, The Court: All right. The case is submitted. I'm going to allow 60 days for simultaneous briefs, and I don't believe we need responding briefs. * * * The Court: During that 60 days, Mr. Westall, you might consult with respondent as to whether you can, in fact, produce material that will satisfy them, although the case is closed as far as I'm concerned; they still might be willing to make some adjustments with you if you can come up with evidence, but that's between you and the respondent. Petitioner did not produce any new evidence for respondent during the 60 days between trial and when the briefs were due. We will not now consider evidence which he failed to present at trial. Petitioner has also submitted two supplemental briefs. Respondent has not submitted any supplemental briefs. The Court did not request *450 these additional briefs. In fact, we stated we did not think responding briefs were necessary in this case. Petitioner was informed at trial that each party would submit only one brief. Therefore, all of petitioner's arguments should have been in this first brief. If petitioner had an overwhelming need to bring new arguments to the Court's attention, then he should have requested that the court permit him to file a supplemental brief. Petitioner did not take this action. The supplemental briefs will not be considered. We now address the substantive issues in the case. Petitioner has the burden of proof on all the issues before the Court. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Alimony
Petitioner claims that in 1978 he paid his ex-wife Jacqueline $ 3,000 alimony and his ex-wife Rosinda $ 5,675 in alimony. [5] Petitioner states that a substantial portion of the payment to Rosinda represented payment for back alimony. Petitioner makes similar claims for the 1979 and 1980 tax years. For the 1979 taxable year he claims to have paid Jacqueline Westall alimony of $ 1,200 and Rosinda Westall alimony of $ 2,200. For the 1980 taxable year *451 petitioner claims he paid Rosinda $ 2,950 and that part of the payment was for back alimony. In support of his position petitioner submitted the divorce decree from his marriage to Jacqueline. In that decree the Court ordered petitioner to pay $ 30 per week in child support and a fixed amount of $ 5,500 in "alimony." Petitioner did not provide a copy of the divorce decree from his marriage to Rosinda.
Whether the payments in fact represent alimony is a question that turns upon the facts, not upon any labels placed upon them. Ryker v. Commissioner,33 T.C. 924, 929 (1960). The deductibility of alimony payments under section 215 is determined by reference to section 71(a). Section 71(a) provided generally that if a wife is divorced and the husband is required to make periodic payments to the wife pursuant *452 to the divorce decree or other written instrument, then the wife must include the periodic payments in her gross income. Section 71(c)(1) provided that installment payments which discharge part of an obligation, the principal sum of which is specified in the decree or instrument, are not considered a periodic payments, unless by the terms of the decree the amount is to be paid in installments over a period exceeding 10 years. Section 215 allows a corresponding deduction to husbands who make periodic payments under section 71. The facts in this case do not support petitioner's contention that the payments to Jacqueline Westall were periodic alimony payments as described in section 71. The divorce decree submitted by petitioner clearly specifies that petitioner was required to pay Jacqueline a total sum of $ 5,500. There is no provision for periodic payments. Moreover, the $ 5,500 payment is not subject to any of the contingencies of death, remarriage, or changed economic status. Thus, the exception described in section 1.17-1(d)(3), Income Tax Regs., does not apply. Therefore petitioner is not entitled to any deduction for alimony paid to Jacqueline *453 Westall in 1978 or 1979. Petitioner is likewise denied an alimony deduction for payments made to Rosinda Westall between 1978 and 1980. Petitioner failed to introduce any evidence at trial which substantiated his obligation to make periodic payments to Rosinda Westall. Moreover, since petitioner also claims portions of the payment to Rosinda were for back alimony, we do not even know what petitioner alleges was his annual alimony obligation. Petitioner has failed to meet his burden of proof and is denied any alimony deduction for payments made to Rosinda Westall. Personal Exemptions
Petitioner claims he is entitled to a personal exemption for 1978, 1979 and 1980, for his daughter, Marsiella. Petitioner alleges that child support payments he made represented more than one half of Marsiella's support.
Section 152(e) provides [6] special rules regarding dependency exemptions in the case of children of divorced parents. Generally, the custodial parent will be entitled to claim the dependency exemption. There are two exceptions: (1) if the divorce decree provides that the noncustodial *454 parent is entitled to the deduction and the noncustodial parent provides at least $ 600 in child support; or (2) if the noncustodial parent provides at least $ 1,200 in support and the custodial parent fails to clearly establish that she provided more support than the noncustodial parent. Neither of the exceptions apply in this case. Petitioner claims he paid Rosinda Westall $ 7,475 in 1978 and that $ 1,800 of that amount was for child support. In 1979 petitioner claims he paid Rosinda Westall $ 3,850 and that $ 1,650 of this amount was for child support. In 1980 petitioner claims he paid Rosinda Westall $ 4,750 and that $ 1,800 was for child support. Petitioner has not introduced a divorce decree or any type of written document which indicates that he was required to pay the above-mentioned child support. Petitioner has also failed to introduce any checks to substantiate his claim that he in fact made the payments. Even petitioner's accountant testified *455 he "assumed' what portion of the payments to Rosinda Westall were for child support and that petitioner later informed him that his assumption was incorrect. Therefore, we have only petitioner's self-serving testimony to substantiate that the above-mentioned payments were made for child support. Petitioner had the opportunity before trial to secure a copy of his divorce decree or to present witnesses and/or cancelled checks to support his testimony. In the absence of any corroborating testimony we decline to allow petitioner to claim an exemption for Marsiella in 1978, 1979 and 1980. Petitioner failed to meet his burden of proof. Unreported Income 1978
In 1978 petitioner received $ 40,000 or more from his ex-wife Jeanne Westall. Petitioner claims he received the money as loans and that he has repaid a substantial amount through (1) the transfer of his Kentucky home to Jeanne in August 1978, and (2) the payment of $ 6,000 in 1982. Respondent does not deny that petitioner transferred the Kentucky home in 1978 or the $ 6,000 in 1982. However, respondent asserts the money petitioner received in 1978 was income to him either because Jeanne gave him the money to invest *456 on her behalf, which he failed to do and instead converted for his own use; because he stole the money from Jeanne; or, because the money was compensation for services. [7]
We find that Jeanne transferred $ 40,000 to petitioner in 1978 for investment purposes and did not intend it to be a loan. Petitioner failed to make the investments. The facts in this case indicate that the transfer of the new Kentucky home was intended to be a partial repayment of the $ 40,000. We accept petitioner's testimony, which is uncontradicted, that he made a $ 10,000 down payment on the Kentucky property and that the purchase price was in fact $ 58,000. The house therefore had a $ 48,000 mortgage, *457 which Jeanne assumed. Moreover, both petitioner and Jeanne testified that she sold the house to a neighbor the day after the transfer for $ 76,000. We find that this sale was prearranged. Petitioner has taxable income to the extent he did not repay the $ 40,000 in 1978. Petitioner clearly repaid $ 10,000 to Jeanne as represented by his basis in the Kentucky home. Thus, the amount petitioner had to pay was reduced to $ 30,000. The property, while held by petitioner, apparently appreciated another $ 18,000. This $ 18,000 serves to further reduce petitioner's obligation to Jeanne from $ 30,000 to $ 12,000. Thus petitioner had $ 12,000 in unreported income from the $ 40,000 he took from Jeanne but failed to repay. James v. United States,366 U.S. 213 (1961). The transfer of the Kentucky home also resulted in additional tax consequences to petitioner. Since the appreciation served to decrease a debt, the amount of the appreciation, that is, the difference between petitioner's basis in the home and the fair market value of the home, is income to petitioner. As we *458 said in Peninsula Properties Co., Ltd. v. Commissioner,47 B.T.A. 84, 91 (1942), "In each case the transaction is treated as if the transferor had sold the asset for cash equivalent * * * and had applied the cash to the payment of the debt." In this case if petitioner had sold the house he would have realized an $ 18,000 gain. [8] We cannot ignore that amount simply because it was transferred in the form of appreciated property. See also Simms v. Commissioner,28 B.T.A. 988 (1933) (holding that the difference between a husband's basis in stock and the fair market value of that stock, transferred to his wife to repay a legal debt, was income to the husband). The fact that the purchasers later defaulted and Jeanne had to re-sell the house in 1984 does not affect the 1978 tax year. Similarly, the fact that petitioner paid Jeanne an additional $ 6,000 in 1982 does not affect the 1978 taxable year; rather it serves to decrease his *459 income in 1982, a year not before the Court. James v. United States, supra at 220. 1979
On February 15, 1979 petitioner purchased real property in King City, Calif. On July 16, 1979 petitioner exchanged the property in King City for property in Seaside, Calif. As part of the transfer petitioner then sold the property in Seaside. We need to decide the amount of gain, if any, petitioner must recognize on these transactions. Petitioner purchases the property in King City for $ 55,000. Of this amount, $ 47,500 was represented by a note. Petitioner's basis in the King City house was reduced for depreciation. Petitioner claims his basis in the house was increased by $ 7,384 for improvements he made. In the exchange petitioner gave up the King City house and assumed $ 21,790 in existing liabilities on the Seaside house. In return, petitioner received (1) $ 9,354 in cash, [9] (2) the Seaside house valued at $ 50,000, and (3) the assumption of liability existing on the King City house of $ 47,436. Petitioner also incurred selling expenses of $ 3,318 on the exchange. Finally, petitioner suffered a loss of $ 1,816 on the disposition of the house in Seaside. *460 Section 1031(a) provides in general that no gain or loss is recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of a like kind which is to be held either for productive use in a trade or business or for investment. Section 1031(b) provides that if money or other property is received in addition to the "like kind exchange" property the recipient must recognize gain, but only to the extent of money received or the fair market value of the other property. Furthermore, under section 1031(d) the recipient's basis in the exchange property is the same as it was in the property he transferred and any liabilities assumed are treated as money received on the exchange. In this case petitioner's basis in the King City house was equal to $ 54,413. [10] Petitioner has failed to prove the claimed improvements were actually made on the house in King City. Therefore, his basis is *461 not increased above the purchase price. The total gain petitioner must recognize is determined as follows: Received
Cash
$ 9,354
Fair Market Value of Seaside
Property
50,000
Liabilities given up
47,436
Amount realized
106,790
Less: Selling expenses
3,318
Net Amount realized
$ 103,472
Given Up
Cash
-0-
Adj. Basis in
King City Property
54,413
Liabilities assumed
21,790
Net amount paid
76,203
Gain realized
27,269
Less: loss on
sale of Seaside Property
1,816
Gain recognized
$ 25,453
1980
On July 25, 1980 petitioner received a check for $ 5,000 as a "nonrefundable deposit" for the sale of the Del Rio Theater in King City, Calif. Petitioner cashed the check on July 25, 1980. The payor of the check wrote across the back of the check "Cashing of this check confirm the sell of the Del Rio Theater (King City Calif) to Me Tarsicio Soto." Petitioner endorsed the check with the following qualification: *462 I endorse this check with the understanding that Tarsicio Soto will pay to me $ 45,000.00 on Jan. 1, 1981 and then take possession of he Del Rio Reel Joy Theatre, and on this date will execute a note and trust deed for $ 125,000.00 for the remaining balance due me. This initial deposit of $ 5,000.00 is not refundable.
Beneath this qualification petitioner signed his name and Del Rio Theatre. No other funds were received. Respondent accepts petitioner's characterization of the check as a nonrefundable deposit but claims it results in ordinary income to petitioner. Furthermore, respondent asserts that petitioner's qualified endorsement was written after the check was received and therefore it does not necessarily represent the agreement between Soto and petitioner. Conversely, petitioner claims that since the money was for the sale of property and he held the property since 1978, the $ 5,000 constitutes long-term capital gain. As a preliminary matter, although respondent agrees to accept petitioner's characterization of the $ 5,000 as a nonrefundable deposit, we do not. We believe that the $ 5,000 in fact represented an option to purchase the theater which expired in January *463 1981. The fact that petitioner endorsed the check and stated it was a nonrefundable deposit indicates the price of the option was to be applied against the total purchase price of $ 175,000. We are further convinced of our opinion from petitioner's testimony at trial where he stated: What had happened, I had advertised the theater, actually, I'd advertised the theater for sale from the time I bought it in '78, and I advertised in a national publication called "Box Office" magazine, and this happens to be July 21, 1980 issue, the theater is listed in here. And Mr. Soto, who owns Spanish Theaters in Chicago, called me and asked me about the theater and I told him, gave him the information and he says, "That's just what I want." And I said, "Well" -- he said "I'll send you a deposit." And I said, "Well, if you wire me a deposit it's nonrefundable." He says, "No, I want that theater. I want to open up operations in California." So, the gentleman sent me a certified check for $ 5,000 July 25 of 1980. On the back of it is written by him, "Cashing of this check confirms the sale of the Del Rio Theater" to me, "Tarcicio (phonetic) Soto," and then I, in turn, put my endorsement *464 with the terms and so forth and so on, that he had to exercise by January 1, of '81. The man actually called me about the 15th of December, I hadn't heard from him, and he says, "Could I have a short time or more time?" And I gave him until January 15th, and he didn't exercise, or he didn't go through with the sale and he didn't tell me anything, and so ended up -- I had already deposited this in July and that's what this issue is about, the check.
It is clear that there is no income from an option until such time as the option is exercised or lapses. Section 1.1234-1(b), Income Tax Regs. Any gain realized on the failure to exercise an option is ordinary income. Section 1.1234-1(b), Income Tax Regs. Therefore, we agree with respondent that petitioner realized ordinary income on the $ 5,000 payment from Soto. However, we accept that petitioner's qualified endorsement and his testimony at trial reflected the agreement of the parties. Therefore, contrary to respondent's position, we hold that petitioner did not realize any gain *465 until 1981, when the option lapsed. Schedule C Deductions
In 1978 petitioner claimed $ 138,548 in Schedule C expenses. Respondent allowed deductions totaling $ 105,136. In 1979 petitioner claimed $ 100,909 in Schedule C expenses. Respondent allowed $ 68,043. In 1980 petitioner claimed Schedule C expenses of $ 106,898, and respondent allowed $ 79,903. Remaining at issue are deductions for the following expenses: advertising, car and truck, depreciation, legal and professional, rent, repair, concession supply, taxes, travel and entertainment, film rental and delivery, and wages. In order to be entitled to any additional deductions petitioner must prove that these expenses were incurred in a trade or business and that the expenses were "ordinary and necessary." Sec. 162; Rule 142(a). Petitioner presented insufficient evidence to prove his entitlement to any advertising, rent, repair, concession supply, tax, travel and entertainment and wage expenses. In most instances petitioner presented only his own self-serving testimony and perhaps some cancelled checks that do not clearly *466 indicate the payments were business related. That is, for the rent, repair, concession supply and wage expenses petitioner presented checks payable to individuals or stores which could have represented payment for any number of personal expenses. On brief petitioner also attempted to recategorize most of his advertising expenses either as travel and entertainment or as car and truck expenses. However, petitioner failed to present any evidence to substantiate his claim. The same holds true for all of petitioner's other travel and entertainment expenses. Petitioner testified about trips he made between his two California theaters and his excursions to pick up films throughout California; unfortunately for petitioner, this falls far short of the specific substantiation requirements of section 274. As a result, petitioner is not entitled to any of the above claimed deductions. Car and Truck
Petitioner claimed the following truck and car expenses: 1978
$ 5,748
1979
9,747
1980
3,443
Respondent has allowed petitioner deductions of $ 400 for each of the years in question. Petitioner owned two theaters between May and September of 1978. Petitioner failed *467 to maintain any type of log to substantiate his business miles and also failed to produce any receipts for actual car and truck expenses at trial.
In limited circumstances when a taxpayer fails to produce evidence substantiating his entitlement to a deduction the Court will estimate deductions taxpayers are permitted to claim. We do this only when the taxpayer has convinced us that he in fact incurred an expense in the conduct of his trade or business and he has provided us with a means for estimating the expense he incurred. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). We do not believe petitioner has provided any basis to increase his car and truck expenses for 1979 or 1980. Petitioner has, however, convinced us that he traveled between King City and Monterey on a regular basis for five months of 1978, the period in which he owned two theaters. We treat this as local transportation and find that petitioner traveled approximately 2,640 miles. Using a figure of 17 cents per mile, petitioner would have incurred car and truck expenses of $ 448. Since respondent *468 has already allowed petitioner a deduction of $ 400, petitioner may claim an additional $ 48 in auto expenses for the 1978 taxable year. Depreciation
Petitioner claimed depreciation as follows for the years in question: 1978
$  4,658
1979
11,476
1980
12,809
Respondent disallowed a portion of each of these claimed deductions. The major controversy for all the years in question is the correct useful life for a theater that petitioner bought in 1978. Petitioner contends that appropriate useful life is 10 years while respondent asserts the appropriate useful life is 20 years. Petitioner bases his opinion on the fact that the building was constructed in 1926 and was 52 years old when he purchased it. Petitioner further contends that in past cases where courts have determined the appropriate useful life for theaters the longest useful life was 59 years. Thus, 10 years plus the 52 years of age of the building creates a 62 years useful life, which petitioner contends is reasonable. Respondent contends petitioner has failed to produce any evidence to support his position.
*469 "Useful life" is defined as "the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business * * *." (Emphasis added.) Section 1.167(a)-1(b), Income Tax Regs. This determination is made with reference to the taxpayer's experience with similar property, accounting for present conditions and probable future developments. We also consider (1) the wear and tear and decay or decline of the property from natural causes, (2) the normal progress within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals and replacements. Sec. 1.167(a)-1(b), Income Tax Regs.
In this case petitioner presented no evidence to support his claim that the building would have a useful life of 10 years as a theater. He also presented no evidence to contradict respondent's determination that the theater had a useful life of 20 years. Therefore, petitioner must utilize a 20 year useful life in determining his annual depreciation on the theater. The depreciation *470 of several equipment items are also at issue. Petitioner failed to present any evidence as to his basis in any of these items or when they were placed in service. As a result he may not take depreciation deductions in excess of that which respondent has already allowed. Legal and Professional
Petitioner claimed legal and professional fees as follows for the years in question: 1978
$ 3,522
1979
3,130
1980
3,075
Petitioner's attorney, Mark Sincoff, testified at trial. Sincoff stated he represented petitioner in a civil action his ex-wife Jeanne filed against him and in a sale of the Del Rey Theater which fell through. Sincoff also represented petitioner in two divorce actions. [11]Sincoff was unable to allocate his legal fees among the various representations. In order to be entitled to a deduction for *471 legal and professional fees petitioner must prove the expenses were incurred in carrying on his trade or business or paid in connection with the production of income. Sections 162 and 212. Whether a particular legal expense is deductible depends on whether or not the claim arises in connection with the taxpayer's profit seeking activities. It does not depend on the consequences that might result to a taxpayer's income producing property from the failure to defeat the claim * * *. [United States v. Gilmore,372 U.S. 39, 48 (1963). Emphasis in original.] In this case petitioner argues that Sincoff was hired to protect his business interests. In fact, however, Sincoff was hired to represent him in a divorce action which, as a consequence, required the protection of is business assets. Moreover, since petitioner is unable to allocate what portion of the fees paid to Sincoff in 1980 were for the failed sale of the theater, and he has not provided any facts upon which we may estimate an allocation, ( Cohan v. Commissioner, supra), none of the fees paid to Sincoff are deductible.[12]
*472 In addition, petitioner paid Joseph Landreth, an attorney, $ 3,407.40 in 1978. Petitioner testified that $ 2,500 of his amount was attributable to relieving petitioner and Jeanne Westall from liabilities on the purchase of the black of buildings in which the Del Rey Theater was located. According to petitioner after he and Jeanne entered the agreement they realized that the rents they could collect would not exceed the mortgage payments. The legal costs incurred in rescinding this business deal are deductible. Therefore, accepting petitioner's testimony in conjunction with the parties' stipulation that the check was written, petitioner is entitled to deduct $ 2,500 in legal expenses in 1978. Petitioner has, however, failed to substantiate his entitlement to the additional $ 907.40 in legal expenses paid to Landreth. Film Rental and Delivery
During the years at issue petitioner claimed the following film rental and delivery expenses: 1978
$ 37,070
1979
30,051
1980
33,906
Respondent disallowed a portion of these claimed deductions in each year for lack of substantiation. At trial petitioner testified that on several occasions he actually went *473 to pick up films and respondent has failed to allow any deduction for those occasions. This is a familiar argument in this case. Petitioner claimed part of his truck and car expense was attributable to local travel between his two theaters in order to transport films. Petitioner also claimed that part of his travel and entertainment expenses were incurred for trips he made to pick up films. We have already allowed petitioner car and truck expenses for five months of 1978 for local transportation between the two theaters he owned. In addition, respondent has allowed petitioner deductions of $ 400 for car and truck expenses in 1979 and 1980. Respondent has also allowed a substantial portion of petitioner' claimed film rental and delivery expenses. We are not certain on what basis respondent allowed these deductions. However, for the Court to allow additional film delivery deductions without substantiation could lead to a duplication of deductions. Without more evidence we will not allow petitioner any additional deductions for film delivery. The check disbursement schedule for 1978 indicates that $ 2,531.76 in film rental expenses are still at issue. One check was payable to *474 Mitchell Bros. We have no evidence that the check was in fact for film rental. Two other checks, however, were payable to Freway Films and John Denver Film Rental. These two checks were for film rental; as a result petitioner is entitled to an additional film rental deduction of $ 531.76 for the 1978 taxable year. There is no indication on the check disbursement schedule for the 1979 taxable year that checks payable to any film rental companies were disallowed. Instead, all of the disallowed deductions were for checks payable to individuals. Petitioner has failed to produce any evidence which convinces us that these checks to individuals were really film rental expenses. Therefore, he is not entitled to any additional deduction in 1979. In 1980 all of the film rental and delivery expenses respondent disallowed were for payments to individuals or some type of aviation or travel company. Petitioner presented no evidence that the payments to individuals were actually for film rental. Also, as we have already stated, petitioner's lack of substantiation for his travel expenses precluded him from deducting any aviation costs as travel and entertainment expenses. His lack of substantiation *475 similarly precludes petitioner from deducting aviation costs as film delivery expenses. Petitioner is not entitled to any additional deductions in 1980. Investment Tax Credit
Petitioner claims he is entitled to investment tax credits in the following amounts: 1978
$ 315
1979
622
1980
515
Respondent allowed $ 300 of the investment tax credit in 1978 and disallowed all of petitioner's claimed credits in 1979 and 1980. Section 38, sets forth the general rule that a credit is available for investment in certain property. In order to be eligible for the credit the property must be depreciable. Anderson v. Commissioner,446 F.2d 672, 674 (5th Cir. 1971). In order to be depreciable the taxpayer must have a basis in the property and prove it is used in a trade or business. Petitioner has not presented any evidence which contradicts respondent's determination or supports his position that he is entitled to these credits. Therefore, petitioner is not entitled to claim investment tax credits in excess of those previously allowed by respondent. Self-employment Tax
Petitioner claims he is not liable for self-employment tax in 1978 *476 because he suffered a loss from self-employment during that year. We have found as a fact, however, that petitioner did have income from self-employment during 1978 and he is therefore liable for self-employment tax for that year. Similarly, petitioner earned income from self-employment both in 1979 and 1980. He is also liable for self-employment tax in those years. Additions to Tax - Failure to File
Section 6651(a)(1) provides for an addition to tax when a taxpayer fails to file a return. The addition to tax is imposed unless it is shown that the failure was due to reasonable cause and not willful neglect. Under section 6651(a)(1) the amount of the addition to tax is 5 percent of the total deficiency for each month the return is not filed, but not in excess of 25 percent. Petitioner has the burden of proving he is not liable for the additions to tax. Rule 142(a). Before trial petitioner stipulated to the fact that he did not file tax returns in 1978, 1979 or 1980. Petitioner also admitted that he earned income from rental property, auto sales and the operation of a *477 movie theater during those years. In his brief, filed in accordance with this Court's order, petitioner failed to address any of the additions to tax. At trial petitioner offered no evidence to show that his failure to file was due to reasonable cause and not willful neglect. Petitioner has failed to meet his burden of proof. Davis v. Commissioner,81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985); Fischer v. Commissioner,50 T.C. 164, 177 (1968). Since petitioner has failed to file any returns for the years in question he is liable for additions to tax under section 6651(a)(1) equal to 25 percent of the underpayment. Additions to Tax - Negligence
Section 6653(a) provides for an addition to tax equal to 5 percent of any underpayment attributable to negligence or disregard of the rules or regulations. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). *478 Petitioner has the burden of proving the additions to tax for negligence do not apply. Bixby v. Commissioner,58 T.C. 757 (1972); Rule 142(a). Petitioner has offered no evidence to contradict respondent's determination. The additions to tax under section 6653(a) must stand for the 1978, 1979 and 1980 taxable years. Additions to Tax - Failure to Pay Estimated Tax
Respondent determined an addition to tax under section 6654 for failure to pay estimated tax for 1979 and 1980. Petitioner has the burden of proving the addition to tax under section 6654 does not apply. Petitioner has provided no evidence to contradict respondent's determination which, therefore, must stand. Reaver v. Commissioner,42 T.C. 72, 83 (1964). To reflect the foregoing. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years in question and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioner concedes on brief that his original claim of an investment tax credit in the amount of $ 875 for 1980 was incorrect because there was no carryover from 1979 to 1980. ↩
3. Respondent contends petitioner received $ 40,000 from Jeanne Westall in 1978. According to a complaint Jeanne filed on October 25, 1978, petitioner received $ 51,700 from her. She alleged he received $ 20,000 on December 5, 1977, $ 10,000 on February 6, 1978, $ 1,400 on April 5, 1978, $ 10,300 on April 20, 1978 and $ 10,000 on August 2, 1978. It is not clear why or how respondent arrived at a figure of $ 40,000. However, at trial Jeanne Westall confirmed that she believed petitioner originally owed her that approximate sum. ↩
4. Throughout the trial and in the documentary evidence this theater was referred to as the Del Rio Theatre, the Del Rey Theatre and the Reel Joy Theatre interchangeably. ↩
5. There apparently is a typographical error in petitioner's brief where he claims first that he paid Rosinda $ 5,075 but that $ 600 was erroneously included in child support and therefore, "The alimony deduction should be increased from $ 8,075 to $ 8,675." ↩
6. Sec. 152(e) has since been amended by sec. 423(a) of Pub. L. 98-369, 98 Stat. 799 and also by sec. 104(b)(1)(B) of Pub. L. 99-514, 100 Stat. 2104. Sec. 152(e)↩, as explained above, applied to all of the years at issue. 7. Respondent's third alternative,t hat the money was compensation, arises from a lawsuit that Jeanne Westall filed against petitioner. In that suit Jeanne sought to recover the $ 40,000 at issue here. Petitioner cross complained that he had earned that money for managing Jeanne's money. He alleged he was entitled, pursuant to an agreement, to one half of the profits of her business for managing her money. In that complaint petitioner claimed his share of her profits was approximately $ 150,000. ↩
8. We assume that petitioner realizes short-term gain or ordinary income rather than long-term capital gain on this transfer because he failed to produce any evidence to prove how long he held the Kentucky home. ↩
9. Petitioner claims he never collected this money, but he failed to prsent any evidence to substantiate his claim. ↩
10. Petitioner's basis equalled ↩
$ 55,000
purchase price
less
587
depreciation
$ 54,413
11. Sincoff testified that he was hired to represent petitioner primarily for purposes of the property settlement and that he was not hired to represent petitioner in his divorce since neither party can contest a divorce in the State of California. ↩
12. We also note even if petitioner could allocate a portion of his legal expenses to the failed sale of the Del Rey Theater the cost would not be currently deductible; instead the cost would be added to the taxpayer's basis or offset against its selling price. Woodward v. Commissioner,397 U.S. 572, 578↩ (1970).